# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

JUNE P. PIPPIN,             )
                                     )
          **Plaintiff,**       )
                                     )     **Civil Action No. 2:04-0033**
**v.**                        )     **Judge Nixon / Knowles**
                                     )
**JO ANNE BARNHART,**      )
**Commissioner of Social Security**   )
                                     )
         **Defendant.**      )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 11. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 13.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

# I.  INTRODUCTION

Plaintiff filed her applications for DIB and SSI on February 16, 1999, alleging that she had been disabled since November 11, 1997, due to arm and elbow problems.  Docket Entry Number 9, Attachment ("TR"), TR 35; 53-55; 227-229.  Plaintiff's applications were denied both initially (TR 34-35; 230-236) and upon reconsideration (TR 36-38; 237-240).  Plaintiff subsequently requested (TR 47-48) and received (TR 31) a hearing.  Plaintiff's hearing was conducted on December 17, 1999, by Administrative Law Judge ("ALJ") William Bivins.  TR 191; 197.  Plaintiff and vocational expert ("VE"), Patsy Bramlett, appeared and testified.  TR 191.

On February 24, 2000, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 191-197.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).
>
> 4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

2

6.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.      The claimant has the following residual functional capacity: wide range of light work requiring no more than minimal use of the left arm and hand in a low stress work setting with no set production goals.

8.      The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1545 and 416.965).

9.      The claimant is an "individual closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

10.     The claimant has a "high school equivalent education" (20 CFR §§ 404.1564 and 416.964).

11.     The claimant has unskilled past work experience (20 CFR §§ 404.1568 and 416.968).

12.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.13 as a framework for decision-making, there are a significant number of jobs in the national economy which she could perform.  Examples of such jobs include work as from report don't you see [*sic*]

14.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 196-197.

On March 1, 2000, Plaintiff timely filed a request for review of the hearing decision.  TR 207-209.

On May 2, 2003, the Appeals Council issued a letter remanding the case to an

3

Administrative Law Judge because the tape recording of Plaintiff's December 17, 1999 hearing could not be located and the record was therefore incomplete. TR 210-212.

Plaintiff's second hearing was conducted on October 6, 2003, by Administrative Law Judge ("ALJ") Jack B. Williams. TR 241. Plaintiff and vocational expert ("VE"), Kenneth Anchor, appeared and testified. *Id.* At the time of this hearing, Plaintiff had returned to work full-time, and she sought disability benefits for the period of time from November 1997 through April 2001. TR 248.

On November 28, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 11-21. Specifically, the ALJ made the following findings of fact:

1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's left medial/lateral epicondylitis with associated supinator syndrome (alternate diagnosis of cubital tunnel syndrome), history of hypothyroidism, and an adjustment disorder with depressed mood are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to

4

lift/carry 20 pounds occasionally and 10 pounds frequently, and to sit, stand and walk 6 hours each, provided that she avoid [*sic*] constant use of left upper extremity and production type jobs, i.e., essentially unskilled to low semi-skilled jobs.

7. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "person closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 414.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Such jobs were identified and enumerated by the vocational expert.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 20-21.

On December 3, 2003, Plaintiff timely filed a request for review of the October 6, 2003 hearing decision. TR 9-10. On February 20, 2004, the Appeals Council issued a letter declining to review the case (TR 6-8), thereby rendering the decision of the ALJ the final decision of the

Case 2:04-cv-00033   Document 14   Filed 07/27/05   Page 5 of 30 PageID #: 5

Commissioner.  This civil action was thereafter timely filed, and the Court has jurisdiction.[1]  42

U.S.C. §§ 405(g) and 1383(c)(3).  If the Commissioner's findings are supported by substantial

evidence, based upon the record as a whole, then these findings are conclusive.  *Id.*


## II.  REVIEW OF THE RECORD

### A.  Introduction

Plaintiff was born on December 5, 1948, and has a high school education.  TR 225; 230.

She alleges disability due to left arm and elbow problems.  TR 35.

### B.  Medical Evidence

Dr. Paul A. Abbey examined Plaintiff on January 21, 1998.  TR 172-173.  Dr. Abbey

noted that Plaintiff "essentially is left hand dominant" and that she "has discomfort

predominantly in the left arm and elbow since December of 1997."  TR 172.  Plaintiff also

reported "tingles in her fingers" accompanied by a "swollen type of sensation."  *Id.*  Dr. Abbey

noted that Plaintiff had gone to "four or five [therapy] sessions without any change."  *Id.*  Dr.

Abbey reported that Plaintiff had "slight irritability of the ulna nerve in flexion of the elbow, a

negative Tinel's and Phalen's distally, [and] a negative Tinel's proximally."  *Id.*  Dr. Abbey also

noted that Plaintiff was "markedly tender at the lateral epicondyle but unfortunately somewhat

this is diffuse in nature."  *Id.*  Dr. Abbey stated that "the questions are whether or not this is

purely lateral epicondylitis or is there some associated supinator syndrome.  Furthermore, is this

cubital tunnel and/or carpal tunnel or a combination of both."  TR 173.  Dr. Abbey injected

---

[1] The Court's review concerns the October 6, 2003 hearing and ALJ Williams' decision issued November 28, 2003.

Plaintiff with Marcaine and Depo-Medrol, and noted that he would place her in a therapy program. *Id.*

Plaintiff returned to Dr. Abbey on February 4, 1998. TR 171. Dr. Abbey noted that Plaintiff had been seen by a therapist and that her left elbow and arm continued to bother her. *Id.* Dr. Abbey noted "slight improvement," and stated that if Plaintiff did not continue to improve with therapy, he might opt to inject her "area of supinator and or [*sic*] EMG" and perform a nerve conduction study test. *Id.*

Dr. Abbey examined Plaintiff on February 18, 1998. TR 170. Plaintiff brought notes from her therapy sessions. *Id.* Dr. Abbey noted that Plaintiff "has some good days and some bad days without apparent cause." *Id.* Dr. Abbey further noted that Plaintiff had some "slight benefit" from iontophoresis, but that the benefit did not last very long. *Id.* Dr. Abbey reported that Plaintiff's discomfort "tends to be mostly in the supinator mass." *Id.* Dr. Abbey noted that Plaintiff's arm would need time to recover, and that there were elements of Plaintiff's examination that were consistent with supinator syndrome. *Id.* Dr. Abbey stated that there did not appear to be any obvious radial nerve dysfunction. *Id.* Dr. Abbey placed Plaintiff on modified work. *Id.*

On March 25, 1998, Dr. Abbey examined Plaintiff and noted that Plaintiff continued to have pain in discomfort in her left elbow and forearm. TR 169. Dr. Abbey further noted that Plaintiff was starting to have paresthesias. *Id.* Dr. Abbey opined that Plaintiff's symptoms were consistent with carpal tunnel syndrome. *Id.* Dr. Abbey further opined that "[t]here certainly appears to be elements of both lateral epicondylitis and supinator syndrome." *Id.* Dr. Abbey administered an injection, which relieved some of Plaintiff's pain. *Id.* Dr. Abbey noted that

7

Plaintiff would continue therapy.  *Id.*

Dr. Abbey examined Plaintiff on April 13, 1998.  TR 168.  Dr. Abbey noted that Plaintiff had not been able to work since the previous November, and that she "does not really note great improvement."  *Id.*  Dr. Abbey reported that Plaintiff's "long finger test" and "resistive supination" caused Plaintiff pain and discomfort.  *Id.*  Dr. Abbey stated that he suggested that Plaintiff consult Dr. Mike Milek for a second opinion and possible surgery.  *Id.*

On May 6, 1998, Dr. Abbey wrote a letter to Dr. David Schmidt asking him to provide a second opinion on Plaintiff's condition.  TR 166-167.  In this letter, Dr. Abbey opined that Plaintiff had "supinator syndrome plus/minus lateral epicondylitis."  TR 167.

Dr. Abbey examined Plaintiff on June 11, 1998, and reported that Plaintiff's supinator problem had "improved dramatically," and that Plaintiff's primary concern was discomfort on the medial side of her elbow.  TR 165.  Plaintiff stated that she did not wish to have another injection, so Dr. Abbey opted to place Plaintiff in therapy and put her in a "cubital tunnel splint." *Id.*  Dr. Abbey noted that "C5-T1 are grossly intact otherwise, no evidence of motor deficit to the ulnar nerve is noted, no obvious evidence of C8-T1 radiculopathy is noted."  *Id.*  Dr. Abbey also noted that Plaintiff had "no intrinsic wasting, no weakness at the first doesal interosseous, FCU, or FDP small and ring."  *Id.*

Dr. Abbey examined Plaintiff on June 29, 1998 and noted that Plaintiff "has not made a lot of progress on the medial side at all."  TR 164.  Dr. Abbey further noted that "[t]he tingles are present even without the splint on."  *Id.*  Dr. Abbey noted that "we will get an EMG and nerve conduction study test looking for both the supinator syndrome and the cubital tunnel syndrome." *Id.*

8

Dr. Michael P. Moore examined Plaintiff on July 23, 1998, and performed electroneurographic studies on Plaintiff. Dr. Moore's findings were as follows:

> 1. The left ulnar sensory study showed normal distal latency and amplitude of the SNAP.
> 2. The left median sensory study showed normal distal latency and amplitude of the SNAP.
> 3. The left ulnar segmental motor study showed normal distal latency. The amplitude of the CMAP was normal with stimulation at the wrist below and above elbow. Conduction velocity in the forearm and across the cubital tunnel was within normative values.
> 4. The left median motor study showed normal distal latency and amplitude of the CMAP. Conduction velocity in the forearm was normal.
> 5. The left ulnar F wave study was within normal limits at 27.1.
> 6. The right ulnar F wave study was within normative values at 25.3 milliseconds.
> 7. The left radial sensory study showed normal distal latency and amplitude of the SNAP.
> 8. The left radial motor study showed normal distal latency and amplitude of the CMAP. Conduction velocity in the forearm was normal.

TR 159. Dr. Moore also noted that "[n]eedle EMG examination of the left upper extremity and associated paraspinals showed no abnormal insertional or abnormal spontaneous activity." *Id.* Dr. Moore's impression was that Plaintiff's electrodiagnostic studies were "normal," and, specifically, that "there was no electrodiagnostic evidence of a left cubital tunnel syndrome, left carpal tunnel syndrome, entrapment neuropathy of the posterior interosseous nerve or radial nerve or evidence of a cervical radiculopathy." *Id.*

Plaintiff returned to Dr. Abbey on July 23, 1998. TR 158. Dr. Abbey reported in part, "She has discomfort about her elbow that seems to be laterally and medially [*sic*], although quite honestly her major symptoms appear to be medially." *Id.* Dr. Abbey noted the tests that had been conducted by Dr. Moore that same day, stating, "She had an EMG and nerve conduction

9

study test which basically showed stage I cubital tunnel. That is, no obvious electrical evidence but does have clinical evidence to suggest cubital tunnel." *Id.* Dr. Abbey administered an injection of Marcaine and DepoMedrol to Plaintiff. *Id.* He also noted, "I am not terribly optimistic though that she will be able to return to work because of the diffuse nature of her problems, but we are taking them one at a time." *Id.*

Dr. Abbey examined Plaintiff on August 12, 1998, and noted that Plaintiff "now has troubles on the lateral side of her elbow." TR 157.[2] Dr. Abbey noted that Plaintiff "made some improvement" in the area of her arm that he had previously injected. *Id.* Dr. Abbey further noted, "I'm not so sure there's anything further that I have left to offer her. I am not optimistic of her ability to return to Wilson Sporting Goods without discomfort, but I am optimistic that she'll get improvement to the point where I think she'll be comfortable given enough time and the right circumstances." *Id.* Dr. Abbey stated that he thought Plaintiff should go to "vocational rehab." *Id.*

Dr. Abbey completed an "Attending Physicians Report" on August 12, 1998, in which he indicated that Plaintiff was not to lift more than five pounds, push or pull, perform overhead work, do "heavy gripping," or run heavy machinery.[3] TR 174.

Dr. Abbey examined Plaintiff on September 14, 1998, stating that Plaintiff "really isn't any better at this point, but did have her FCE." TR 155.[4] Dr. Abbey noted that he had yet to fully examine Plaintiff's Functional Capacity Examination ("FCE") results. *Id.* Dr. Abbey

_____

[2]This record is repeated at TR 156.

[3]Dr. Abbey made diagnoses supporting these limitations, but they are illegible.

[4]This record is repeated at TR 154.

further noted:

> In essence, the initial evaluation was that she was at a sedentary physical demand, that she did not do particularly well on her validity criteria, 37% were invalid, and she may have done submaximal effort during her functional capacity evaluation. Nonetheless, her non material handling skills were average. Her strength percentile was very low, and I don't believe she will be able to return to regular duty at Wilson Sporting Goods. I do believe she has reached maximum medical improvement, but I will need to further interpret her FCE before I can make final determination.

TR 155.

Dr. Abbey examined Plaintiff on September 15, 1998, after having reviewed Plaintiff's FCE results in depth. TR 153. Dr. Abbey noted that Plaintiff's results demonstrated her ability to perform at the "sedentary physical demand." *Id.* Dr. Abbey suggested the possibility of a work conditioning program to increase Plaintiff's overall strength, left upper extremity function, and cardiovascular fitness. *Id.* Dr. Abbey noted as follows:

> Minimal to no repetitive motion to either the left or right upper extremity which includes elbow, forearm, wrists, hands, fingers. These restrictions would also include no lifting greater than 20-25 pounds other than on occasional attempts. Patient was able to perform fine motor skills and is qualified on assembly tasks of pieces in the one to four millimeter range or larger at a non production rate. Therefore, she is classified at the low speed assembly classification.

TR 153.

Dr. Abbey examined Plaintiff on October 8, 1998, and noted that there was "no real change" in Plaintiff's condition. TR 151.

In a letter dated October 9, 1998, Dr. Abbey made the following recommendations regarding Plaintiff:

11

Ms. Pippin demonstrated the ability to perform work at the sedentary physical demand level. Her material handling ability is between 5 and 30 lbs, depending upon the position and frequency of the activities. Her non-material handling skills were average. Specific recommendations include that she could overhead lift, shoulder lift, carry, push, or pull between 5 and 10 lbs occasionally; frequently from 3 to 5 lbs; constantly 0 lbs. She can sit, stand, and walk frequently; bend, reach, climb, squat, kneel, crawl occasionally. Hand function was thought acceptable, including simple grasping, fine work, pushing, pulling, and low speed assembly bilaterally. Physical demand classification of the work is sedentary, which is occasionally lifting 10 lbs; frequently and constantly negligible amount of weight is acceptable [*sic*]. In addition, I would add that she should minimize repetitive grasping and activities which require her to use her left upper extremity including her forearm and her hand. At this point and time [*sic*], there should be permanent restrictions that some time in the future could be amended, pending her symptomatic improvement or lack of improvement.

TR 152.

Dr. Abbey examined Plaintiff on December 3, 1998, at which time he discussed with Plaintiff her functional capacity assessment. TR 150. Dr. Abbey noted that Plaintiff continued to have discomfort at the lateral epicondyle in the area of her supinator. *Id.* Dr. Abbey administered an injection to Plaintiff. *Id.*

Dr. Abbey examined Plaintiff on January 7, 1999. TR 148. Dr. Abbey noted that Plaintiff was "now at Vocational Rehab," and that the relief in her arm was only "temporary." *Id.* Dr. Abbey opined that Plaintiff "may be a candidate for a supinator/lateral epicondylar release." *Id.* Dr. Abbey further opined that Plaintiff had reached maximum medical improvement, and that he had nothing further to offer her. *Id.*

The records from Dr. Abbey include a "return to work capability" form dated January 7, 1999. TR 149. This form, however, is incomplete. *Id.*

12

A letter to Plaintiff from her insurance company dated February 12, 1999, noted that Plaintiff had reached maximum medical improvement on September 14, 1998. TR 147. The letter also noted that Dr. Abbey had stated that Plaintiff retained a "7% permanent impairment to the extremity for your work injury of November 11, 1997." *Id.*

Dr. Clarence Jones examined Plaintiff on March 16, 1999. TR 176. Plaintiff complained of headaches, and Dr. Jones diagnosed Plaintiff with "headaches," "anxiety neurosis," "insomnia," and "anxiety-Dipression [*sic*]." *Id.*

A DDS physician[5] completed a Physical Residual Functional Capacity Assessment regarding Plaintiff on March 19, 1999. TR 117-124. This physician opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull without limitation. TR 118. The physician further opined that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl. TR 119. The physician noted that Plaintiff's ability to reach in all directions was limited in her left arm. TR 120. No other manipulative limitations were noted. *Id.* No visual, communicative, or environmental limitations were noted. TR 120-121.

Dr. Robin Richard completed a Physical Residual Functional Capacity Assessment regarding Plaintiff on June 2, 1999.[6] TR 125-132. Dr. Richard opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or

---

[5]The name of the physician who completed this assessment is illegible.

[6]Dr. Richard made handwritten notes on her assessment. These notes, however, are largely illegible.

walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull without limitation. TR 126. Dr. Richard further opined that Plaintiff could frequently climb a ramp or stairs, balance, stoop, kneel, crouch, and crawl. TR 127. Dr. Richard noted that Plaintiff could occasionally climb a ladder, rope, or scaffold. *Id.* Dr. Richard further noted that Plaintiff's ability to reach in all directions was limited. TR 128. No other manipulative limitations were noted. *Id.* No visual, communicative, or environmental limitations were noted. TR 128-129.

Dr. Linda Blazina, a licensed psychologist, performed a consultative psychological examination of Plaintiff on June 7, 1999. TR 181-187. Dr. Blazina noted that Plaintiff was "considered to be a valid historian." TR 181. Dr. Blazina also noted that Plaintiff was "alert and fully cooperative" during the examination, that her mood was "depressed," and that her affect was "appropriate." TR 182. Dr. Blazina further noted that Plaintiff did not report a history of psychotic symptoms or suicidal ideation. *Id.* Dr. Blazina stated that Plaintiff "cried frequently throughout the interview and she reported a number of depressive symptoms." *Id.* Plaintiff reported weight loss of fifteen pounds, trouble sleeping, feelings of sadness, lack of energy, crying spells, irritability, difficulty relaxing, and difficulty concentrating. *Id.* Plaintiff also reported headaches, stomach discomfort, back pain, neck pain, and chronic pain in her arm. *Id.* Dr. Blazina stated that Plaintiff's attention and concentration skills were "mildly impaired," but that she was "adequately oriented" to time, place, person, and situation. *Id.* Dr. Blazina noted that Plaintiff told her that she was unable to work because of the injury to her left arm. TR 183. Plaintiff reported that she was able to dress, bathe, and feed herself; that she had no trouble managing cash or a checkbook; and that she was able to drive a car for short distances. TR 184.

14

Plaintiff stated that she did her household chores, but that they took "much longer" because of her chronic pain. *Id.* Plaintiff also stated that she cooked, enjoyed reading, and did the laundry. *Id.*

Dr. Blazina's diagnostic impressions included: "[a]djustment disorder with depressed mood"; "[r]ule out major depressive disorder, single episode, no psychotic features"; "[r]ule out pain disorder associated with both psychological factors and a general medical condition (injury to left arm and shoulder)"; "chronic pain, financial problems, recent loss of relationship with boyfriend, recent conflict with ex-husband"; and "Current [Global Assessment of Functioning score] 55-60, past (premorbid) 75-85." TR 185.

Dr. Blazina also made the following assessment of Plaintiff's ability to do work-related activities:

> At the time of this evaluation, her ability to understand and remember does not appear to be significantly limited at this time. Her ability to sustain concentration and persistence does appear to be limited due to her depression and chronic pain in that she may have difficulty carrying out detailed instructions and may difficulty [*sic*] maintaining her attention and concentration for extended periods. In addition, she may have difficulty completing a normal work day without interruptions from psychologically based symptoms. Ms. Pippin's social interaction abilities appear to be limited due to her depression and chronic pain in that she may have decreased ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. She does, however, have the ability to ask questions and request assistance, accept instructions and maintain socially appropriate behavior. Her adaptation abilities may be limited in that she may have difficulty responding appropriately to changes in a work setting due to her chronic pain and depression.

TR 185. Dr. Blazina reported that Plaintiff stated that "[vocational rehab] told her that she needed to go to college or sit with elderly or disabled people, neither of which appear to be a

viable option for her."  TR 185-186.

Ed Sachs, Ph.D., completed a mental Residual Functional Capacity Assessment on June 10, 1999.  TR 133-135.  Dr. Sachs opined that Plaintiff was "Moderately Limited" in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to respond appropriately to changes in the work setting; and to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  TR 133-134.  Dr. Sachs further opined that Plaintiff was "Not Significantly Limited" in all other listed categories.  TR 133-134.

On June 10, 1999, Dr. Sachs also completed a Psychiatric Review Technique form regarding Plaintiff.  TR 137-145.  Under the heading of "Medical Disposition(s)," Dr. Sachs noted, "RFC Assessment Necessary."  TR 137.  Dr. Sachs noted that his medical disposition was based on the category of "Affective Disorders."  *Id.*  Dr. Sachs further noted that Plaintiff demonstrated no evidence of a sign or symptom which appropriately fit with the categories of: organic mental disorders; schizophrenic, paranoid, and other psychotic disorders; mental retardation and autism; anxiety related disorders; somatoform disorders; personality disorders; or substance addiction disorders.  TR 139-143.  Dr. Sachs noted that Plaintiff demonstrated "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome," which was evidenced by "[d]epressive syndrome" characterized by: "[a]nhedonia or pervasive loss of interest in almost all activities"; "[a]ppetite disturbance with change in weight"; "[s]leep disturbance"; "[d]ecreased energy"; "[f]eelings of guilt or worthlessness"; and "[d]ifficulty concentrating or thinking."  TR 140.  Dr. Sachs noted that Plaintiff had a "Slight" restriction of

16

activities of daily living and "Slight" difficulties in maintaining social functioning. TR 144. Dr. Sachs further noted that Plaintiff "Often" had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. *Id.* Dr. Sachs also noted that Plaintiff "Never" showed episodes of deterioration or decompensation in work or work-like settings which would cause Plaintiff to withdraw from that situation or to experience exacerbation of her signs and symptoms. *Id.* Finally, Dr. Sachs noted that none of the "above functional limitations" manifested at the "degree of limitation that satisfies the listings." *Id.*

Records dated July 15, 1999, were obtained from Plateau Mental Health Center. TR 221-226. With regard to Plaintiff's history and behavior at the examination, the examiner essentially reiterated the findings of Dr. Blazina. TR 225-226. Plaintiff presented with: "depression, sleep problems, change of activity level, fatigue, feelings of worthlessness, inability to concentrate, anxiety, excessive worry or fear, irritability, eating difficulties, job loss due to medical problems and crying episodes." TR 226. The individual who examined Plaintiff[7] noted the following diagnostic impressions: "Adjustment Disorder With Mixed Anxiety and Depressed Mood"; "problems with left arm; migraine headaches"; "medical problems; employment/financial; primary support/severe"; and "GAF, Current = 055." *Id.*

### C. Plaintiff's Testimony

Plaintiff testified that she quit work at "Wilson's" in November 1997, and that she received a Workers' Compensation award for a job-related injury. TR 246. Plantiff reported that when she first suffered her injury, she went to "a place out here on Allgood Highway, 10th

---

[7]The name and credentials of the individual who examined Plaintiff are illegible.

17

Street," but that this doctor's office had closed and that she did not know what happened to him. TR 246-247. Plaintiff reported that this doctor sent her to Dr. Abbey. TR 247.

Plaintiff stated that she worked as a cashier at K-mart from November 1997 through October or November 2000. TR 247. Plaintiff also stated, however, that she worked at K-mart for a total of six months. *Id.* Plaintiff reported that she worked 40 hours per week during the holiday season, but only 12 to 16 hours per week after the new year. *Id.* After the Christmas rush was over, she made minimum wage. TR 250. Plaintiff estimated that her paycheck would be $150 for two weeks' work, bringing her monthly income to approximately $300. *Id.* The ALJ and Plaintiff's lawyer then discussed the fact that this work did not constitute substantial gainful activity, and the ALJ stated, "I'm going to count that as a [*sic*] unsuccessful work attempt." TR 250-251.

Plaintiff testified that she was then-currently working at Baymont Inn and Suites. TR 247. Plaintiff reported that she cleaned rooms and did laundry, and that her title was "assistant supervisor." TR 248. Plaintiff stated that she had worked at Baymont Inn and Suites since April 2001. *Id.*

Plaintiff reported that she was requesting a "Period of Disability" for a closed period between November 1997 and April 2001. TR 248. Plaintiff testified that she began working full-time at the end of the closed period. *Id.*

Plaintiff testified that she worked at Wilson's Sporting Goods between 1972 and 1974 as a machine operator, and again from 1986 through 1997 or 1999.[8] TR 248-249. Plaintiff stated

---

[8] The transcript states in pertinent part, "I worked at Wilson's from '86 until '97-'99, whenever they discharged me." TR 249. Plaintiff claims, however, that her Period of Disability began in November 1997.

that, while working for Wilson's Sporting Goods, she carried bundles that she believed weighed 50 or 75 pounds. *Id.* Plaintiff added that she used "different machines" at this job. TR 250.

Plaintiff testified that she went back to work in April 2001 at a motel. TR 251. Plaintiff stated that she did not lift any more than she had to because of her arm, and that she limited the weight she could pick up to 10 pounds. *Id.* Plaintiff stated that no one at her job complained about the pace at which she worked. *Id.* Plaintiff added that she and her co-workers all did the same amount of lifting. *Id.* Plaintiff stated that she also cleaned rooms when "they need me to go out and clean rooms." *Id.* Plaintiff reported that, when she cleaned rooms, she did not lift, but that she did "a lot of repetitive cleaning, motions with the arms." TR 252. Plaintiff added that she thought that she started this job on April 20, 2001. *Id.*

Plaintiff reported that her arm had not been doing well since she received treatment. TR 252. Plaintiff stated that she got a lump sum from her "Workmans' Comp" settlement, and that she also had "lifetime medical." *Id.*

Plaintiff testified that she lived with her 18-year-old daughter. TR 253. Plaintiff stated that she could drive a car, but not for a long period of time. *Id.* Plaintiff testified that she did her household chores, but that "it takes me longer." *Id.*

Plaintiff described the pain in her arm as "constant," and stated that her hands were then-currently numb.[9] TR 253. Plaintiff added that the pain in her elbow was worse some days than others, and that the medication she had taken did not help. *Id.* Plaintiff testified that she received Novocaine and Cortisone shots in her elbow. TR 253-254. Plaintiff stated that these

---

[9] The transcript states, "My hands right now are numb." TR 253. The record does not indicate, however, that Plaintiff was ever treated for problems with her right hand.

shots did not help her pain. TR 254. Plaintiff testified that when her medication did not work, "I just suffer through [the pain]." *Id.*

Plaintiff testified that she was left-handed. TR 254. Plaintiff reported that the last doctor she saw old her that there was "nothing else that can possibly be done." *Id.* Plaintiff added that the doctor told her that she could "op [*sic*] for surgery." *Id.* Plaintiff stated that her doctor did not encourage her. *Id.*

### D.  Vocational Testimony

Vocational expert ("VE"), Kenneth Anchor, also testified at Plaintiff's hearing. TR 255-261.

The VE testified that Plaintiff's past relevant work as a motel housekeeper was light and unskilled, that Plaintiff's past relevant work as a cashier was light and semi-skilled, that Plaintiff's past relevant work as a sewing machine operator was light and semi-skilled, and that Plaintiff's past relevant work as a bundler was medium and unskilled. TR 256.

The ALJ then stated that he was going to "strike" Plaintiff's cashier job at K-Mart from the list of her past relevant work, as discussed above. TR 256. The ALJ then asked for clarification regarding Plaintiff's past relevant work as a housekeeper, and Plaintiff replied that she worked as a housekeeper for three months in 1986. TR 257. The ALJ subsequently "struck" that job as well. *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 257-258. The VE answered that the hypothetical claimant could not perform any of

20

Plaintiff's past relevant work.  TR 258.

The VE opined that in the State of Tennessee, there are approximately 20,000 jobs such as storage attendant, supply attendant, inventory attendant, quality control clerk, and general clerk, all of which would be appropriate for the hypothetical claimant.  TR 258.  The VE added that in the national economy, there were more than one million jobs available that would be appropriate for the hypothetical claimant.  TR 259.  The VE explained that the jobs that the hypothetical claimant could perform included light jobs that were unskilled or "lower level semi-skilled," and that these jobs did not require strict production standards.  TR 258.  The VE testified that these jobs would be "more at lower end of the stress continuum."  TR 259.

The ALJ then modified the hypothetical to include the limitation of "decreased ability to get along with co-workers and peers without distracting them or exhibiting behavioral extremes."  TR 259.  The VE replied that if "it was going to be on an occasional basis, it wouldn't affect these jobs," but added that, "if it was going to happen on a frequent basis, that would certainly be a negative or unfavorable factor for work."  *Id.*

The ALJ then asked the VE how many days per month the hypothetical claimant could miss work and still maintain employment.  TR 259-260.  The VE replied that, in his experience, employers "draw the line" at two missed days per month, and that three or more absences per month would result in disciplinary action.  TR 260.  The VE then testified that he based his opinion on surveys of employers in Tennessee, Alabama, and Kentucky.  *Id.*

The VE stated that the jobs he mentioned were light jobs, and therefore the amount of lifting required in those jobs would range from five to 10 pounds, and would occasionally require lifting 15 to 20 pounds.  *Id.*

21

Plaintiff's attorney then asked the VE if any of the jobs he mentioned would be unavailable to someone who could frequently lift between three and five pounds and constantly lift zero pounds. TR 261. The VE replied that these limitations would rule out the "light jobs not identified." *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence

22

supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

23

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[10] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability

---

[10]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).


### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred by not finding that Plaintiff was disabled pursuant to the medical-vocational guidelines and by not finding that Plaintiff's mental impairments met or equaled "Section 12.04."  Docket Entry No. 12.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery*

*v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. The Medical-Vocational Guidelines

Plaintiff argues that she is disabled pursuant to the medical-vocational guidelines, also known as "the grid." Docket Entry No. 12. In particular, Plaintiff argues that the ALJ erred by not giving sufficient weight to Dr. Abbey's opinions. *Id.* Plaintiff essentially implies that had the ALJ given sufficient weight to Dr. Abbey's findings, Plaintiff would have been disabled pursuant to the medical-vocational guidelines. *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we

26

apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...

    (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

    (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

    (5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

    ...

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Abbey treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions.  Dr. Abbey's opinion, however, contradicts other substantial evidence in the record.  Dr. Abbey's findings are both internally inconsistent, and inconsistent with other substantial evidence in the record.

On October 9, 1998, Dr. Abbey found that Plaintiff could lift and/or carry between five and 10 pounds occasionally and could carry no weight constantly.  TR 152.  On September 15, 1998, however, Dr. Abbey stated that Plaintiff's restrictions included "no lifting greater than 20-25 pounds other than on occasional attempts."  TR 153.  On that date, Dr. Abbey noted that

27

Plaintiff demonstrated "symptom exaggeration" and "submaximal efforts," in her functional capacity testing. *Id.* Furthermore, Dr. Abbey's findings contradict those of Dr. Richard and the unidentified physician who evaluated Plaintiff on March 19, 1999. TR 117-132; 152; 153.

As the ALJ also noted, Dr. Abbey referred to "clinical" evidence of cubital tunnel syndrome, when EMG studies recorded no evidence of that condition. TR 17. As discussed above, Plaintiff's EMG studies performed July 23, 1998, were "normal." Nevertheless, Dr. Abbey wrote, in a note dated that same day: "She had an EMG and nerve conduction study test which basically showed stage I cubital tunnel. That is, no obvious electrical evidence but does have clinical evidence to suggest cubital tunnel." TR 158.

As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence, and the final decision regarding the weight to be given to the conflicting evidence lies with the Commissioner. *Id. See also* 20 C.F.R. § 416.927(e)(2). As such, the Regulations do not mandate that the ALJ accord Dr. Abbey's evaluation controlling weight. Accordingly, Plaintiff's argument fails.

## 2. Section 12.04

Plaintiff argues that the ALJ erred by finding that Plaintiff's mental impairments did not meet or equal Section 12.04 of the Medical-Vocational Guidelines. Docket Entry No. 12. The ALJ's conclusion that Plaintiff's mental impairments did not meet or equal Section 12.04 was

28

based upon substantial evidence.

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." Additionally, the ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff and the VE. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff's mental impairments did not meet or equal Section 12.04. In particular, Dr. Sachs' assessment specifically stated that Plaintiff did not satisfy the requirements of Paragraph B in listing 12.04. TR 144.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

E. CLIFTON KNOWLES
United States Magistrate Judge

30